# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| BRENT CONFORTI, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:23-cv-0059 Judge Aleta A. Trauger |
| JEFFREY C. OWEN; MICHAEL M. CALBERT; WARREN BRYANT; ANA CHADWICK; PATRICIA FILI-KRUSHEL; TIMOTHY MCGUIRE; WILLIAM C. RHODES III; DEBRA A. SANDLER; RALPH SANTANA; TODD VASOS; CARMAN WENKOFF; JOHN GARRATT; RHONDA TAYLOR; STEVE SUNDERLAND; and AMELIA ELLIOTT, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| DOLLAR GENERAL CORPORATION, a Tennessee corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM

The defendants and nominal defendant have filed a Motion to Dismiss the Amended Stockholder Derivative Complaint (Doc. No. 29), to which plaintiff Brent Conforti[1] has filed a Response (Doc. No. 37), and the defendants have filed a Reply (Doc. No. 42). For the reasons set out herein, the motion will be granted.

---

[1] In both the original Complaint and the Amended Complaint, Conforti asserts, in the caption, that he is seeking to sue "on behalf of all others similarly situated." (Doc. No. 1 at 1; Doc. No. 14 at 1.) As the defendants point out, however, nothing in the Complaints suggests that this is a class action case. Conforti is, in fact, seeking to sue on behalf of Dollar General Corporation, the nominal defendant. The court also notes that at least one defendant's first name (Anita Elliott) appears to be incorrect in the caption.

# I. BACKGROUND[2]

Dollar General Corporation ("Dollar General") is a large, Tennessee-based discount retailer. (Doc. No. 14 ¶ 14.) Ten of the named defendants—Todd Vasos, Jeffrey C. Owen, Michael M. Calbert, Warren Bryant, Debra Sandler, William C. Rhodes III, Ralph E. Santana, Ana Chadwick, Patricia Fili-Krushel, and Timothy McGuire—are members of Dollar General's Board of Directors. Of those ten, two have held executive positions within the company: Vasos, who was CEO until 2022, and Owen, who succeeded Vasos in that position. The other eight board member defendants are directors only. The five remaining defendants—Cameron Wenkoff, John Garratt, Rhonda Taylor, Steve Sunderland, and Anita Elliott—are Dollar General executives without seats on the board. (*Id.* ¶¶ 15–29.) This lawsuit concerns allegations that the defendants, in their respective positions of responsibility, oversaw an epidemic of employee safety failures at Dollar General facilities, resulting in numerous injuries and millions of dollars in penalties assessed by the Occupational Safety and Health Administration ("OSHA"), which has designated Dollar General a "Severe Violator" of the nation's occupational safety laws.[3] (*Id.* ¶¶ 36–41.)

Conforti, who initiated the suit, is a private individual who owns Dollar General stock. As a stockholder, Conforti stands to suffer some potential harm from poor decisionmaking by Dollar General's board and management, insofar as that poor decisionmaking negatively affects

---

[2] These facts are taken primarily from the Verified Stockholder Derivative Complaint (Doc. Nos. 14 (redacted), 17 (unredacted)) and are accepted as true for the purpose of the Motion to Dismiss.

[3] Retail establishments like Dollar General may not be the type of workplace that first comes to mind when one imagines a severe OSHA violator. Dangers to the safety of employees, however, are not limited to factory floors and construction sites. Individuals who work in the retail sector must contend with, among other things, the many tons of merchandise that move in and out of their stores—often in heavy, stackable boxes or crates—which can cause both routine and catastrophic injuries. Retail workers also face dangers arising from their accessibility to the public, including risks of armed robbery or encounters with otherwise dangerous individuals. And, of course, retail employees face the same potential risks that can arise in any workplace, such as risk of fire, toxic mold, unsafe floor surfaces, and so on.

2

the value of his shares of Dollar General stock. Conforti, however, did not bring this lawsuit based solely on that limited, personal exposure. Rather, Conforti wishes to assert these claims on behalf of Dollar General itself, in what is known as a "stockholder derivative" suit—a "form of action [that] permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991)) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534, (1970)). "Whether or not a corporation shall seek to enforce in the courts a cause of action for damages"—against its own executives or against anyone else—"is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 532 (1984) (quoting *United Copper Secs. Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263 (1917)). Dollar General, however, is chartered under Tennessee law, and Tennessee law permits stockholder derivative suits "[i]n some situations." *Keller v. Est. of McRedmond*, 495 S.W.3d 852, 867 (Tenn. 2016) (citations omitted).

Conforti argues that this is one such situation. That, though, is not entirely up to him. "A shareholders' derivative action seeks redress for a wrong to the corporation, and the right of the shareholder to maintain the action is derivative or secondary." *Keller v. Est. of McRedmond*, 495 S.W.3d 852, 868 (Tenn. 2016) (citing 12B Fletcher Cyc. Corp. § 5908). The shareholder's capacity to sue, therefore, is a qualified one, and it hinges on his satisfaction of both the substantive requirements of the relevant state's law of corporations and the procedural requirements of the relevant court's rules of civil procedure. *See Kamen*, 500 U.S. at 97. In a federal court, derivative actions are governed by Rule 23.1, which provides that such actions are procedurally allowed, if adequately pleaded by an appropriate plaintiff. Fed. R. Civ. P. 23.1(a).

Rule 23.1, however, does not provide guidance as to when, if ever, a stockholder has a legitimate right to file a derivative action, leaving that issue to the substantive law of the relevant jurisdiction.

Tennessee's requirements for bringing a stockholder derivative suit involving a for-profit corporation are set out in Tenn. Code Ann. § 48-17-401. The statute states that a "person may not commence a proceeding in the right of a domestic or foreign corporation unless the person was a shareholder of the corporation when the transaction complained of occurred or unless the person became a shareholder through transfer by operation of law from one who was a shareholder at that time." Tenn. Code Ann. § 48-17-401(a). The statute also addresses the need for the plaintiff to make a pre-suit litigation demand on the corporation's board, but, somewhat confusingly, discusses Tennessee's rule as a pleading requirement without endorsing any particular substantive standard:

> A complaint in a proceeding brought in the right of a corporation must be verified and allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why the person did not make the demand. Whether or not a demand for action was made, if the corporation commences an investigation of the charges made in the demand or complaint, the court may stay any proceeding until the investigation is completed.

Tenn. Code Ann. § 48-17-401(b). On its face, Tenn. Code Ann. § 48-56-401(b) requires nothing other than adequate pleading of the facts; a plaintiff could plead, with particularity, that he made no pre-suit demand purely because he did not want to, and, technically, he would have complied with the express requirements of Tenn. Code Ann. § 48-56-401(b). "[F]or more than a century," however, Tennessee courts have construed the state's laws as including a substantive "demand requirement." *Memphis Health Ctr., Inc. ex rel. Davis v. Grant*, No. W2004-02898-COA-R3CV, 2006 WL 2088407, at *10 (Tenn. Ct. App. July 28, 2006) (citing *Lewis ex rel. Citizens Sav. Bank*

4

& *Tr. Co. v. Boyd*, 838 S.W.2d 215, 221 (Tenn. Ct. App. 1992)). Generally speaking, to meet that requirement, an aspiring derivative plaintiff must "first make a written demand on the corporation's directors requesting them to prosecute the suit or to take other suitable corrective action." *Lewis*, 838 S.W.2d at 221.

The demand requirement, however, "may be excused" if the "demand would be futile." *Krajenta v. Westphal*, No. W2021-00832-COA-R3-CV, 2022 WL 4483412, at *4 (Tenn. Ct. App. Sept. 27, 2022) (citing *Humphreys v. Plant Maint. Servs., Inc.*, No. 02A01-98-11-CV-00323, 1999 WL 553715, at *6 (Tenn. Ct. App. July 30, 1999); *Lewis*, 838 S.W.2d at 221). This approach, broadly speaking, follows the pattern of the Delaware demand requirement, which this court and others have been frequently called upon to apply, due to that state's popularity as a site of incorporation. *See, e.g., Anders v. Baier*, No. 3:21-CV-0373, 2022 WL 4097332, at *8 (M.D. Tenn. Sept. 7, 2022). Those broad similarities, however, do not necessarily mean that the standards are identical in their details, and a federal district court's duty, when it considers a question of Tennessee law, is to try to apply the law in the manner that the Tennessee Supreme Court would. *See Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607 (6th Cir. 2012) ("Faithful application of a state's law requires federal courts to 'anticipate how the relevant state's highest court would rule in the case,' and in doing so we are 'bound by controlling decisions of that court.'") (quoting *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005)).

Conforti initiated this lawsuit on January 20, 2023. (Doc. No. 1.) He alleges that the defendants have presided over a "sustained failure . . . to implement and maintain an effective system of internal controls," resulting in persistently "hazardous working conditions for [the company's] employees." (Doc. No. 14 ¶ 1.) He seeks to assert derivative claims for breach of the defendants' fiduciary duty to Dollar General, waste of Dollar General's assets, and unjust

enrichment at Dollar General's expense. (*Id.* ¶¶ 148–73.) Conforti concedes, however, that he did not provide Dollar General with a formal litigation demand before filing suit. (*Id.* ¶ 119.) He argues that such a demand would have been futile, because Dollar General's directors—whom he has named as defendants—would have been unable to evaluate the litigation demand objectively and in the interests of the corporation.

On April 3, 2023, the defendants filed a Motion to Dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. No. 29). The defendants argue that the court should dismiss Conforti's claims because he has failed to allege facts sufficient to support the exercise of federal jurisdiction. (Doc. No. 29 at 2.) They also argue that, insofar as the court does exercise jurisdiction in this case, it should dismiss the claims because Conforti did not comply with the demand requirement and has not alleged facts sufficient to support the conclusion that he is excused from that requirement. (*Id.*) Finally, the defendants argue that, even if Conforti is able to overcome those two obstacles, the court should dismiss the claims because he has not sufficiently alleged the elements of any cause of action. (*Id.*)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack "questions merely the sufficiency of the pleading," and the court therefore takes the allegations of the complaint as true. *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 816 (6th Cir. 2017) (quoting *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007); citing *Ohio Nat'l Life Ins. Co. v.*

6

*United States*, 922 F.2d 320, 325 (6th Cir. 1990)). The defendants allege that Conforti has failed to "plead facts to support the Court's diversity jurisdiction," making their argument a facial attack. (Doc. No. 30 at 14.)

## B. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).

Typically, the Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Moreover, the ordinary pleading requirements of Rule 8 may be supplemented by additional, more demanding pleading requirements specific to certain claims or allegations. Rule 23.1 requires that a stockholder derivative complaint:

(1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;

(2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and

(3) state with particularity:

(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

(B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1; *see McCall v. Scott*, 239 F.3d 808, 815–16 (6th Cir. 2001).

## III. ANALYSIS

### A. Diversity Jurisdiction

Federal courts possess "only such jurisdiction as is defined by the Constitution and granted by Congress." *United States v. Glover*, 242 F.3d 333, 335 (6th Cir. 2001) (internal quotation marks and citation omitted). It is, therefore, "presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citation omitted). Moreover, "jurisdiction is not the kind of thing that can be waived or forfeited." *Williams v. United States*, 927 F.3d 427, 434 (6th Cir. 2019) (citation omitted). Federal courts, therefore, have "an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and . . . must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Id.* (quoting *Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)).

"The Constitution provides that the 'judicial Power shall extend' to"—among other things—"'Controversies . . . between Citizens of different States.'" *Hertz Corp. v. Friend*, 559

8

U.S. 77, 84 (2010) (quoting U.S. Const., art. III, § 2). That language has been construed as an authorization, not a mandate, leaving it up to Congress to decide whether, and to what extent, the "judicial Power" to hear such cases translates to actual federal court jurisdiction. Congress, however, has provided for at least some federal jurisdiction over cases between citizens of different states—often referred to as "diversity jurisdiction"—since the early days of the federal judicial system. *See id.* ("Congress first authorized federal courts to exercise diversity jurisdiction in 1789 . . . ."). Diversity jurisdiction is the form of jurisdiction that Conforti has invoked in this case, based on the fact that he is a citizen of Oregon, and the defendants—like Tennessee-based Dollar General—are not.

"In a diversity action, 'the plaintiff must state all parties' citizenships such that the existence of complete diversity can be confirmed.'" *Washington v. Sulzer Orthopedics, Inc.*, 76 F. App'x 644, 645–46 (6th Cir. 2003) (quoting *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 177 F.3d 210, 222 n.13 (3d Cir. 1999)). Conforti's Amended Complaint—like his original Complaint—fails that requirement. As the defendants point out, "the Complaint only alleges [that Conforti] 'resides' in Oregon and Dollar General is a Tennessee citizen, and says nothing about the citizenship of the individual defendants." (Doc. No. 30 at 14.) Conforti, in his Response, offers no meaningful defense of his jurisdictional pleading, arguing only that the deficiencies "can easily be remedied by amendment" and providing a list of the defendant-by-defendant assertions of non-Oregon citizenship that such an amendment would make. (Doc. No. 37 at 29–30 & n.12.)

The court could grant the defendants' Motion to Dismiss based on Conforti's insufficient pleading alone. That course of action would hardly be the most efficient, though, given that Conforti could simply refile his claims with the geographic details he says he is ready to assert.

The court will, therefore, move on to the question of whether those facts, if actually pleaded, would sufficiently support the exercise of this court's jurisdiction.

Diversity jurisdiction exists only when "no plaintiff and no defendant are citizens of the same state." *Curry v. United States Bulk Transp., Inc.*, 462 F.3d 536, 540 (6th Cir. 2006). If any defendant is a citizen of the same state as any plaintiff, "then complete diversity, and with it federal jurisdiction, [is] destroyed." *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009) (citing *Caudill v. N. Am. Media Corp.*, 200 F.3d 914, 916 (6th Cir. 2000)). Stockholder derivative suits, however, present a challenge to that approach by introducing a tension between the parties' practical roles and their formal ones. As a practical matter, this lawsuit involves claims initiated by Oregon-based Conforti, challenging actions taken by Tennessee-based Dollar General and a number of Dollar General executives, none of whom are alleged to be citizens of Oregon. As a formal matter, though, Conforti is asserting claims on behalf of Dollar General, not against it. That raises the unavoidable question of which side of the diversity jurisdiction formula Dollar General should be considered to be on: the defendants' side, which would arguably capture its actual role in this litigation, or the plaintiff's side, which would arguably be more consistent with the formal allocation of rights being asserted. That question, in this instance, is determinative, because several of the defendants are, like Dollar General, citizens of Tennessee, meaning that, if they appear opposite to the company, then this court lacks jurisdiction.

Theoretically, the courts could resolve questions such as these in a purely formalistic way. Under that approach, this court would probably lack jurisdiction here, because Dollar General is, technically speaking, asserting claims in the manner of a plaintiff—even if it has been dragged into that position against its will. The Supreme Court, however, has definitively rejected

10

such a mechanical approach. *See Smith v. Sperling*, 354 U.S. 91, 97–98 (1957). Instead, the court must consider "the alignment of the parties," based not only on how the parties have chosen to "align themselves," but also "their actual 'interests in the litigation.'" *Evanston Ins. Co. v. Hous. Auth. of Somerset*, 867 F.3d 653, 656 (6th Cir. 2017) (quoting *Cleveland Hous. Renewal Project v. Deutsche Bank Tr. Co.*, 621 F.3d 554, 559 (6th Cir. 2010)). In so doing, "[a] court has to pluck out the 'primary dispute in the controversy' from the tangle of interests that the lawsuit implicates," consider the "fiscal, legal, and practical realities of" that primary dispute, and "align the parties according to their interests." *Id.* (quoting *Cleveland Hous. Renewal Project*, 621 F.3d at 559).

The primary dispute in this case concerns whether Dollar General should have devoted more resources and attention to the safety of its employees. Conforti suggests that the short-term expenses associated with that approach would have been worth the cost, but there is no going back and changing decisions that were already made. Dollar General's interest in this litigation, then, is to downplay the extent of its fault in its past employee safety-related decisions. That interest aligns the company squarely with the defendants. The court, accordingly, concludes that Conforti's proposed jurisdictional allegations, if included in an actual complaint, would be sufficient to assert diversity jurisdiction. The court, therefore, will turn to the defendants' other arguments, to determine whether amendment is necessary or whether the court should simply dismiss the claims for some other reason.

**B. Demand Futility**

1. Tennessee's Modified *Aronson* Test

Tennessee recognizes the "business judgment rule," which creates a "presumption that a corporation's directors, when making a business decision, acted on an informed basis, in good

11

faith, and with the honest belief that their decision was in the corporation's best interest." *Summers v. Cherokee Child. & Fam. Servs., Inc.*, 112 S.W.3d 486, 528 (Tenn. Ct. App. 2002) (citing *Lewis ex rel. Sav. Bank & Tr. Co. v. Boyd*, 838 S.W.2d 215, 222 (Tenn. Ct. App. 1992)). That presumption applies to a decision not to pursue a lawsuit, just as it would apply to any other decision made by a corporate board. *Id.* at 529. Typically, then, permitting a single stockholder to circumvent a board decision not to pursue litigation would violate the basic principles of corporate governance in Tennessee.

Those basic principles, however, become more complicated when the directors who would choose to pursue or reject a potential lawsuit are also the potential defendants whom that lawsuit would target. Generally speaking, the presumption afforded by the business judgment rule "does not apply when the director or officer has an interest in the decision." *Id.* at 528 (citations omitted). Some litigants have therefore suggested that, any time a lawsuit against a majority of directors is proposed, a formal pre-suit demand can be assumed to have been futile. *See Lukas v. McPeak*, 730 F.3d 635, 638 (6th Cir. 2013) (discussing plaintiffs' interpretation of *Deaderick v. Wilson*, 67 Tenn. 108, 131 (1874)). That categorical rule, however, would pose its own potential complication: any stockholder could bypass the board simply by naming enough directors as defendants, regardless of their actual complicity in the wrongful activity alleged. An approach that simply assumed that a board could not consider a lawsuit in which its members were named would avoid director conflicts, but it would risk doing so in a way that rewarded gamesmanship at the expense of the integrity of the corporate form.

There are, in other words, points to be made in favor of a liberal approach to stockholder derivative suits and other points to be made in favor of a more demanding standard. It is not, however, up to this court to choose between those options, for two reasons. First, and as the court

12

has already mentioned, this is a question of Tennessee law, and this court therefore must try to answer it in the same manner as the Tennessee Supreme Court has or would. *See Berrington*, 696 F.3d at 607. As Conforti points out, however, "the law in Tennessee is far from settled" in this area. (Doc. No. 37 at 9 n.5.) That fact, though, brings the court to the second reason why this court does not have free rein here: while the Tennessee Supreme Court has not resolved the question of what standard should apply to demand futility assertions under Tennessee law, the Sixth Circuit has addressed the issue, and decisions of the Sixth Circuit on issues of state law are binding on this court in the absence of intervening state-law developments that would render the relevant precedent out of date. *See Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009).

Specifically, in *Lukas v. McPeak*, 730 F.3d 635, the Sixth Circuit expressly rejected a reading of Tennessee law that would provide "that demand is automatically futile whenever a majority of company directors is named in a derivative suit." *Id.* at 639. Instead, the Sixth Circuit interpreted Tennessee caselaw to embrace a modified form of what is typically referred to as the "*Aronson* test," after *Aronson v. Lewis*, 473 A.2d 805, 809 (Del. 1984). *Lukas*, 730 F.3d at 640. The *Aronson* test requires a plaintiff to plead, with sufficient particularity that either (1) "the directors are not independent or disinterested" or (2) there is "a reasonable doubt . . . that . . . the challenged transaction was otherwise the product of a valid exercise of business judgment." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 820 (Del. Ch. 2005) (citations and internal quotation marks omitted). The Sixth Circuit noted, however, that most Tennessee opinions applying a test along the lines of *Aronson* had treated its requirements as "conjunctive," rather than "disjunctive," meaning that a plaintiff would need to establish both prongs, not just one or the other. *Lukas*, 730 F.3d at 640.

13

The Sixth Circuit acknowledged that the Tennessee Supreme Court had not resolved the issue and that "at least one" decision by the Tennessee Court of Appeals appeared to limit itself to only the first *Aronson* prong. *Id.* (discussing *Memphis Health Ctr.*, 2006 WL 2088407, at *10). Ultimately, the court concluded that it did not need to decide which version of the modified *Aronson* test the Tennessee Supreme Court would adopt—the conjunctive two-pronged test or the first-prong-only test—because the case at hand could be resolved by relying solely on the first *Aronson* prong. *Id.*

As a matter of Sixth Circuit law, then, a Tennessee plaintiff must show that the proposed defendant directors are not independent or disinterested. *Id.* Whether a plaintiff must also show a reasonable doubt regarding whether the challenged decision was a valid exercise in business judgment is less settled, but the Sixth Circuit found that approach to be more supported by Tennessee caselaw than the alternative. In either case, however, the Sixth Circuit's approach suggests that Delaware cases applying the *Aronson* framework can provide persuasive guidance, where Tennessee's comparatively less robust caselaw of corporations does not definitively resolve a question.[4]

### 2. Application of the Modified *Aronson* Test to Conforti's Allegations

The defendants do not dispute that a substantial risk of personal liability by a majority of Dollar General's directors would be sufficient to satisfy the first (and, potentially, only) prong of Tennessee's modified *Aronson* test. They argue, however, that Conforti has not sufficiently

---

[4] The court notes that Delaware courts do not themselves follow *Aronson* in its entirety anymore. Specifically, the Delaware Supreme Court has superseded the second prong of the test in order to "refocus[] the inquiry on the decision regarding the litigation demand, rather than the decision being challenged." *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1058–59 (Del. 2021) (citation omitted). Whatever the merits of this change, the relevant test, under Sixth Circuit precedent construing Tennessee law, is a modified version of the original *Aronson* inquiry, and the court is aware of no authority that would permit it to abandon a Sixth Circuit precedent construing Tennessee law based on a change in the law of some other state.

pleaded such liability here, particularly in light of the fact that Dollar General's charter includes

what is often referred to as an "exculpatory provision." Specifically, the charter states:

> A director of the corporation shall have no liability to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director provided that this Section 12 shall not eliminate or limit liability of a director for (i) any breach of the director's duty of loyalty to the Corporation or its shareholders; (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or (iii) unlawful distributions under Section 48-18-304 of the Tennessee Business Corporation Act. If the Tennessee Business Corporation Act or any successor statute is amended or other Tennessee law is enacted after adoption of this provision to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Tennessee Business Corporation Act, as so amended from time to time, or such successor statute or other Tennessee law. Any repeal or modification of this Article 12 or subsequent amendment of the Tennessee Business Corporation Act or enactment of other applicable Tennessee law shall not affect adversely any right or protection of a director of the corporation existing at the time of such repeal, modification, amendment or enactment or with respect to events occurring prior to such time.

(Doc. No. 31-29 ¶ 12.)[5]

Generally speaking, "plaintiffs must plead a non-exculpated claim for breach of fiduciary

duty against an independent director protected by an exculpatory charter provision, or that

director will be entitled to be dismissed from the suit." *In re Cornerstone Therapeutics Inc,

S'holder Litig.*, 115 A.3d 1173, 1179 (Del. 2015); *see also Owens ex rel. Esperion Therapeutics,

Inc. v. Mayleben*, No. CV 12985-VCS, 2020 WL 748023, at *7 (Del. Ch. Feb. 13, 2020) (*citing

Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 62 (Del. Ch. 2015)). For

demand futility purposes, then, a "serious threat of liability may only be found to exist if the

---

[5] Though included in the filings, Dollar General's charter is not included in the Amended Complaint. The court, however, will consider it pursuant to the principle that, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Comm'l Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007) (quoting *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir.1999)). The court will also rely on that rule to consider other documents addressed by the Amended Complaint, such as internal audit committee reports.

15

plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts." *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (quoting *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003)). Based on the terms of Dollar General's exculpatory clause, such a claim must involve at least one of the following: (1) breach of the duty of loyalty to Dollar General or its shareholders; (2) bad faith, intentional misconduct, or knowing violation of the law; or (3) unlawful distributions.[6] (Doc. No. 31-29 at 2.)

The defendants characterize Conforti's claims as "*Caremark* claims," another concept taken from a Delaware case—in this instance, *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 960 (Del. Ch. 1996). *Caremark* involved a stockholder derivative suit filed in the wake of a substantial criminal investigation of Caremark, a pharmacy company that was indicted for committing multiple felonies and ultimately entered a guilty plea to one of the charged counts. *Id.* at 960. Unlike in this case, the question of demand futility came before the court not in connection with a motion to dismiss, but in the context of a motion to approve a settlement of the shareholder derivative action. That motion "require[d] the court to assess the strengths and weaknesses of the claims asserted in light of the discovery record." *Id.* at 961. "The proposed settlement provide[d] very modest benefits," meaning that, in order for it to be approved, that approval would have to rest, at least in part, on "the weakness of the plaintiffs' claims." *Id.* at 972. The court considered a number of substantive issues, concluding, "in light of the discovery record, that there [was] a very low probability that it would be determined that the directors of

---

[6] Conforti, apparently recognizing the potential problems that the exculpatory provision creates for his claims, argues that the court should disregard any "argument based on the exculpatory clause . . . as a matter of law," because "an exculpatory provision can only shield directors from liability if the complaint unambiguously states a claim only for a breach of the duty of care." (Doc. No. 37 at 29 (emphasis omitted).) That supposedly dispositive argument, however, is simply a statement of the governing standard that the court must apply—not a shortcut to avoid applying it. There are, as no party disputes, some types of wrongdoing that the exculpatory provision would not protect. If Conforti has actually sufficiently pleaded that type of wrongdoing, then he has pleaded potential for individual liability. Whether he has done so is what the court is called on to decide.

16

Caremark breached any duty to appropriately monitor and supervise the enterprise." *Id.* at 961. That assessment—that the plaintiffs had a low, but not nonexistent, chance of success—was consistent with the parties' modest agreement. The court therefore approved the settlement. *Id.* at 972.

The *Caremark* plaintiffs had alleged that "the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." *Id.* at 967. The court described that theory of individual liability as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," particularly in light of the "good policy reasons why it is so difficult to charge directors with responsibility for corporate losses for an alleged breach of care, where there is no conflict of interest or no facts suggesting suspect motivation involved." *Id.* (citation omitted). The court explained:

> What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions, is that compliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith or rationality of the process employed. That is, whether a judge or jury considering the matter after the fact[] believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests. To employ a different rule—one that permitted an "objective" evaluation of the decision—would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests.

*Id.* (footnote omitted).

Ultimately, the court held that, "[i]n order to show that the Caremark directors breached their duty of care by failing adequately to control Caremark's employees, plaintiffs would have to show either (1) that the directors knew or (2) should have known that violations of law were

occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of . . . ." *Id.* at 971. The court further explained that a "lack of good faith" could be "evidenced by sustained or systematic failure of a director to exercise reasonable oversight." *Id.* at 971. "Bad faith is established, under *Caremark*, when 'the directors [completely] fail[] to implement any reporting or information system or controls[,] or[,] having implemented such a system or controls, consciously fail[] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.'" *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019) (quoting *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

The defendants argue that "[n]o Tennessee court has excused demand based on a *Caremark* theory." (Doc. No. 30 at 1.) Even if that is true, however, this court has no difficulty in concluding that, whether or not the Tennessee Supreme Court would adopt every word of the *Caremark* decision, Tennessee law does not wholly foreclose a demand futility argument in the *Caremark* model. The defendants do not dispute that directors may be liable for violations of the duty of loyalty and/or for acting in bad faith—just as Dollar General's exculpatory clause acknowledges that they may. Why, then, would that cease to be the case when the matter at issue happens to be a director's knowing, bad faith decision to tolerate widespread illegality? The defendants treat *Caremark* liability as if it represents a unique, outlier doctrine that Tennessee would have to bend over backwards to adopt, but the opposite is the case. *Caremark* simply acknowledges that toleration of illegality can, like any other bad corporate decision, give rise to director liability if all necessary preconditions are met. Denying that rule would amount to erecting an artificial barrier around one particular type of corporate wrongdoing and treating it as

18

uniquely incapable of giving rise to director liability. This court does not believe that the Tennessee Supreme Court would adopt such an approach. The court therefore holds that it is possible to establish a potential for director liability based on the director's knowing or reckless toleration of illegality without taking remedial measures.

The mere availability of such a theory, however, does not mean that Conforti has adequately pleaded it, which, the defendants argue, he has not. There is no dispute that most or all of the director defendants—particularly Bryant, Sandler, Rhodes, and Chadwick, who served on the Board's Audit Committee (Doc. No. 14 ¶¶ 18–20, 22)—were generally aware that Dollar General faced an employee safety problem. Significant employee safety issues were brought to the attention of the Audit Committee no later than its November 29, 2016 meeting, where the committee members discussed an audit revealing growing safety problems—in the form of, for example, substantial year-to-year increases in blocked exits and blocked electrical panels—as well as "increased scrutiny" by OSHA and others. (Doc. No. 17 ¶¶ 65–67.) An August 28, 2018 Audit Committee report identified "regulatory non-compliance"—including, specifically, with regard to OSHA—as among the "Catastrophic Risks" facing the company. (*Id.* ¶ 71.) A March 20, 2019 Audit Committee meeting attended by Rhodes, Bryant, Calbert, Fili-Krushel, McGuire, Santana, Vasos, Elliott, Garratt, and Taylor featured a presentation noting the increased OSHA scrutiny and the risks that the company faced in connection with its failures to comply with regulations. (*Id.* ¶ 72.) The same issues were raised in Board and Audit Committee meetings in 2020 and 2021. (*Id.* ¶¶ 75–77.) The problem, therefore, was clearly on the company's—and the individual directors'—radar. Knowledge, though, is not enough to establish liability of exculpated directors. Conforti was also required to allege that a majority of the director

19

defendants, equipped with that knowledge, "took no steps in a good faith effort to prevent or remedy that situation." *Caremark*, 698 A.2d at 971.

To that end, Conforti relies heavily on emphasizing the severity of the problem, on the apparent assumption that he can establish bad faith by juxtaposing the enormity of Dollar General's problem with the meagerness of the Board's response. Those facts are not irrelevant to the court's inquiry, but, as the caselaw makes clear, "bad faith" means more than just "bad management." If Conforti were an employee or a regulator seeking to hold Dollar General accountable for its alleged wrongdoing, then the company's mismanagement of its problems might be enough. Conforti, however, is neither of those things—he is an investor, seeking to pursue a case under the theory that Dollar General is a victim in this situation, due to the wrongdoing of the individuals who operated it. To do so, he must establish that a majority of the Board responded to the problem either by doing nothing whatsoever or engaging only in bad faith and/or disloyal responses. Without such allegations, the directors are insulated from liability by the exculpatory shield that Dollar General chose to grant them in its charter.

Those allegations, moreover, must address the liability of individual directors—not simply the company's leadership as a whole. Delaware courts, in their application of the *Aronson* standard, do not permit a plaintiff to "rely on the 'group' accusation mode of pleading demand futility." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 121 n.36 (Del. Ch. 2009). This court sees no reason to conclude that Tennessee's modified *Aronson* standard, as applied through Rule 23.1, would be any different. To the contrary, it is well-established that particularized pleading, as that concept is understood in the Federal Rules, generally requires defendant-specific allegations. *See, e.g., D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719,

730 (E.D. Mich. 2003) (acknowledging the impermissibility of group pleading under the particularity requirement of Rule 9(b)).

Such group pleading is particularly inappropriate when a derivative plaintiff not only treats the company's board as a single, undifferentiated group, but does so with regard to the entirety of the company's leadership—that is, both its directors and its non-director officers. For example, in this case, the officer defendants were the ones charged with the day-to-day operation of Dollar General, and their potential culpability regarding the company's failings may be easier to establish than that of the eight non-officer directors. Those officer defendants, though, were not the ones to whom Conforti was required, unless excused, to address his litigation demand. What matters is the specific potential liability of the directors—all but two of whom were not engaged in the ground-level management of the company.

Neither Conforti's pleading nor his briefing fully accounts for these obstacles. The closest that he gets to alleging any kind of particularized individual actions by directors, other than the two directors who have served as Dollar General CEO, is that several of them were on the Board's Audit Committee or Nominating Committee, both of which were kept abreast of the company's safety problems. Merely placing a person on a key committee, however, is not an individualized allegation of actual liability. "Just as in a general failure of oversight claim," plaintiffs seeking to establish demand futility based on membership on an audit committee "must provide particularized allegations." *In re Coca-Cola Enterprises, Inc. Derivative Litig.*, 478 F. Supp. 2d 1369, 1378 (N.D. Ga. 2007) (citation omitted), *aff'd sub nom. Staehr v. Alm*, 269 F. App'x 888 (11th Cir. 2008). Moreover, the fact that some directors served on the relevant committees appears, in this instance, to be most relevant to establishing those directors' knowledge of the underlying problem, and knowledge is not reasonably disputed here.

Conforti argues that his "allegations do much more than merely place 'a person on a key committee,' as [the defendants] claim." (Doc. No. 37 at 13.) That "much more," however, never arrives, in either Conforti's Amended Complaint or his briefing. He emphasizes the important responsibilities of the relevant committees in connection with employee safety, but that is nothing more than establishing that the relevant committees were, in the very terminology Conforti dismisses, "key committees." He emphasizes repeatedly just how severe Dollar General's problems were, but that kind of reasoning backward from the challenged decision is, at most, relevant to the (possible) second prong of the modified *Aronson* inquiry, not the first, and has been expressly rejected as a way to establish *Caremark* liability.

Moreover, the materials that Conforti describes as having been presented at Audit Committee and Board of Directors meetings confirm that the Committee was both regularly monitoring the company's employee safety problems and making some efforts to respond to them. For example, Conforti describes a March 15, 2022 Board of Directors meeting, at which employee safety issues were discussed and the Board recommended the use of a "store compliance cross-functional team . . . to identify and understand patterns and behaviors impacting various compliance areas." (Doc. No. 17 ¶ 93.) Conforti scoffs at this course of action, stating that, "[a]fter six consistent years of labeling Dollar General's workplace safety problems as 'catastrophic,' corporate action should have been taken that exceeded the realms of identification and understanding." (*Id.*) He may well be right that Dollar General's response was inadequate, but making the leap from an inadequate response to a substantial risk of non-exculpated liability is precisely the type of reasoning that courts applying *Caremark* have typically rejected.

The sheer volume of information provided to the Audit Committee and the Board regarding Dollar General's issues regarding employee safety forecloses two of the potential routes to establishing liability acknowledged by *Caremark*: showing that the directors completely failed to establish a system for monitoring the problem; or, in the alternative, showing that, despite the availability of such a system, the directors ignored it. *See Marchand*, 212 A.3d at 821. Of course, simply monitoring a problem is not the same thing as addressing it, and Conforti could still show bad faith by establishing that the directors took no meaningful, good faith steps in response to what they learned. Conforti's allegations, however, do not bear that theory out. For example, Audit Committee materials dating back to 2016 confirm that the Board was not simply inertly watching the company's safety problems, but was overseeing specific actions to be taken in response—such as increased investment in pest control services and door repairs. (*See* Doc. No. 17 ¶¶ 66–67; Doc. No. 34-2 at 1686.) Third-party contractors performed thousands of store audits regarding safety.[7] (Doc. No. 17 ¶¶ 77–78; Doc. No. 34-6 at 372.) The Board considered and proposed other concrete steps, such as reviewing company procedures for approaching shoplifters and improving the company's structures for addressing employee complaints. (Doc. No. 34-19 at 625, 637.) Board materials also show a number of steps taken in the name of "robbery avoidance," including the installation of "[r]obust interior/exterior" surveillance equipment. (Doc. No. 34-11 at 1473.) One can doubt whether the aforementioned steps were enough—or even close to enough—given the risks that Dollar General's employees were facing. "Whether the response fixed the problem," however, "is not

---

[7] Conforti attempts to negate these steps by pointing out that inspections were disrupted due to what the defendants state were COVID-related staffing issues with a contractor. (Doc. No. 17 ¶¶ 77–80.) Conforti has not, however, pleaded any facts suggesting that this failure was due to bad faith or violation of the duty of loyalty, and Board materials show that it acknowledged the lapse and planned to expand audits in 2022. (Doc. No. 34-18 at 70.)

23

the test" in this context. *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 684 (Del. Ch. 2023).

Unable to establish the kind of bad faith or disloyalty that *Caremark* would require, Conforti's pleading and briefing return, repeatedly, to the same general argument: that Dollar General's employee safety issues were so severe that the Board's failure to take decisive action, in and of itself, shows that the individual directors can be assumed to face potential personal liability, despite the protection they can claim under Dollar General's clear exculpatory clause. That is a coherent argument, and it is not difficult to imagine some court, in some jurisdiction, adopting it. What matters for the purposes of this case, however, is what the Tennessee Supreme Court would do. The Sixth Circuit has said that Tennessee would apply a modified *Aronson* test, so that much of the question already has an answer. The only open question is whether the Tennessee Supreme Court would construe that test in a way that would leave room for the kind of reasoning backward from corporate wrongdoing that Conforti proposes but that Delaware courts, as the original proponents of the *Aronson* and *Caremark* approaches, have typically rejected. This court's best guess is that the Tennessee Supreme Court would be more likely to hew closely to Delaware's demanding view than to adopt Conforti's more forgiving one. The court, therefore, finds that Conforti's allegations of liability for breach of fiduciary duty are insufficient to establish demand futility under Tennessee law.

The waste and unjust enrichment claims present an additional complication, because those claims involve not simply the alleged mismanagement of the company, but also the company's payments to individual directors. Specifically, Conforti alleges that Dollar General compensated its officers and directors exorbitantly and that, "[i]n light of Dollar General's management not achieving its stated goals, the Board should have clawed back executive

24

compensation for both officers and directors." (Doc. No. 14 ¶ 164.) Because these allegations implicate a direct economic interest of named defendants, they are arguably sufficient to satisfy the first *Aronson* prong. The court, however, finds that, whether or not the Tennessee Supreme Court would adopt the conjunctive, two-prong modified *Aronson* test in all situations, it would likely do so for claims that specifically involve the conferral of economic benefits on defendant directors. Otherwise, demand would be categorically excused in any case that challenged director compensation or directors' financial interests, no matter how well- or poorly-founded the allegations. The court therefore concludes that, at least where the allegations at issue involve financial benefits of directors, a plaintiff must satisfy the second *Aronson* prong—reasonable doubt regarding the directors' exercise of business judgment—to demonstrate demand futility under Tennessee law.

Conforti, however, has offered only conclusory assertions that the payments made to most of the directors were so outside the realm of reasonableness as to escape protection by the business judgment rule. Vasos, in particularly, appears to have been compensated very generously, to the point that one could reasonably question whether that level of payment was in the best interest of the company. Vasos, though, is only one director out of ten, and Conforti has not sufficiently alleged liability for waste or unjust enrichment with regard to enough other directors to render a litigation demand futile. *See In re Goldman Sachs Grp., Inc. S'holder Litig.*, No. CIV.A. 5215-VCG, 2011 WL 4826104, at *16 (Del. Ch. Oct. 12, 2011) ("[T]o excuse demand on a waste claim, the Plaintiffs must plead particularized allegations that 'overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests.'") (quoting *Citigroup*, 964 A.2d at 136).

Because the court finds that Conforti has failed to allege demand futility, Dollar General is entitled to dismissal. The court, therefore, will not consider the substantive merits of Dollar General's decisions any more than has been necessary to resolve that limited issue. It may be that Dollar General has deeply and repeatedly failed in its obligations to its employees. Indeed, if this were simply a lawsuit about whether Dollar General had done enough to protect its employees, the court would likely have little difficulty concluding that Conforti had alleged at least enough to proceed to discovery. This, though, is not a labor enforcement action. It is a case about Dollar General's rights against its directors and officers, and Dollar General elected to grant those directors aggressive protection from liability in its charter. Because Conforti has not pleaded facts sufficient to defeat that protection with regard to a majority of the Board, he was required to give that Board the opportunity to evaluate this proposed lawsuit itself. Because he did not, he lacks the right to bring a stockholder derivative suit under Tennessee law, and the claims that he has attempted to assert will be dismissed, without prejudice to their being raised in a procedurally appropriate manner in future litigation.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss the Amended Stockholder Derivative Complaint (Doc. No. 29) will be granted, and all claims will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

26